UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 4:24-cr-00594-HEA-SRW |
| | ) | |
| JULIAN ALCALA, | ) | |
| | ) | |
| Defendant. | ) | |

## SENTENCING MEMORANDUM

COMES NOW Defendant, Julian Alcala, by and through undersigned counsel, and hereby submits the following Memorandum for sentencing:

### I.       Background

On December 2, 2025, Alcala pled guilty to twenty misdemeanor counts of Deprivation of Rights Under Color of Law, in violation of 18 U.S.C. § 242 (Counts 2 through 21). *See* Presentence Investigation Report ("PSR") at ¶ 1. Based on a criminal history score of zero and a total offense level of 16, the advisory guidelines range is 21 to 27 months' imprisonment. *Id*. at ¶ 207.

For the reasons detailed in this memorandum, Alcala respectfully suggests that a sentence of 21 months' imprisonment is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

### II.       Sentencing Rules

Title 18 U.S.C. § 3553(a) requires this Court to impose a sentence sufficient, but not greater than necessary, to comply with the purposes of sentencing. There are four purposes of sentencing[1]

---

[1] The purposes of sentencing are:
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;

and six factors to consider in connection with them.[2] The guidelines are only one factor to consider and deserve no greater weight than any other factor. *See Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Thus, this Court may not presume a sentence within the guideline range is reasonable. *See Rita v. United States*, 551 U.S. 338, 351 (2007). Nor may it presume a sentence outside the guideline range unreasonable. *See Gall v. United States*, 552 U.S. 38, 51 (2007). Furthermore, this Court may not require "extraordinary circumstances" to justify a sentence below the guidelines nor "use a rigid mathematical formula to determin[e] the strength of the justification required for a specific sentence." *Id.* at 47. These rules apply regardless of whether the guideline derives from the Unites States Sentencing Commission ("the Commission") or a policy determination of Congress. *See Kimbrough*, 552 U.S. at 109-10.

## III.    Alcala's History and Characteristics

Defendant Alcala is a 31-year-old man, born on February 14, 1995 in San Antonio, Texas. PSR at ¶ 174. He had a tumultuous upbringing, being raised by a single mother, Melissa Alcala (age 60), until he was three, and then by his grandfather, Basilio Alcala (now deceased), until he returned to his mother's care in middle school. *Id.* Alcala has never met his father. *Id.* Throughout his adolescence, Alcala was surrounded by alcoholism, substance abuse, and domestic violence, rarely ever getting any sort of parental guidance or support. *See id.*

---

(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.
18 U.S.C. §3553(a)(2)(A)-(D).

[2] The factors to consider in connection with the purposes of sentencing are:
(A)  the nature and circumstances of the offense and the history and characteristics of the defendant;
(B)  the kinds of sentences available;
(C)  the guidelines promulgated by the Sentencing Commission;
(D)  any pertinent policy statement issued by the Sentencing Commission;
(E)  the need to avoid unwarranted sentencing disparities among similarly situated defendants; and
(F)  the need to provide restitution to any victims of the offense.
18 U.S.C. §3553(a)(1)-(7).

When Alcala was age 19, he enlisted in the U.S. Army, proudly serving in areas such as Thailand, the Philippines, South Korea, Washington, Texas, and Colorado, until he was Honorably Discharged in 2021. PSR ¶¶ 176, 200. During his military service, Alcala distinguished himself as an exemplary serviceman, earning various decorations and awards, including all of the following:

- The Army Achievement Medal;

- The Army Good Conduct Medal;

- The National Defense Service Medal;

- The Global War on Terrorism Service Medal;

- The Non-Commissioned Officer Professional Development Ribbon; and

- The Army Service Ribbon.

PSR ¶ 200. Alcala also successfully completed a 14-week Infantryman course and a three-week Basic Leaders course during his time in the army. *Id*. As the PSR itself recognizes, Alcala's decorated and honorable military service presents a mitigating factor that may warrant a downward variance at sentencing. *See* PSR ¶ 228.

Alcala married Jordan Alcala (age 29) during his military service in 2018. PSR ¶ 175. They have two children together, Ronan Alcala (age 6) and Benson Alcala (age 3), as well another child from Jordan's previous relationship, Grayson Alcala (age 9), who Defendant Alcala has raised since Grayson was a one-year-old. *Id*. Their family resides together at their home in Herculaneum, Missouri. *Id*.

## IV.    Alcala's Personal Rehabilitation Warrants a Sentence that Minimizes Any Term of Incarceration

Since his arrest, Alcala has gone above and beyond to address the underlying personal issues that led to the instant offense conduct and to show that, rather than being a danger to the community, he is positive asset. First, he immediately addressed the core issues head-on. From

June 26 through October 17, 2024, Alcala participated in individual counseling for pornography and sexual addiction through Peace in the Storm in San Antonio, Texas. PSR ¶ 179; *see* **Exhibit D** (Michael Wokurka Letter). During that same time, he also participated in weekly marriage counseling to help repair and restore his marriage. PSR ¶ 179.

Then, in September 2024, Alcala joined Encounter Church, actively participating as a church member, attending weekly small group bible study sessions, and devoting a substantial amount of time to volunteer work through the church. *See* **Exhibit A** (Pastor Holder Letter/Volunteer Log). As the church's Executive Pastor attests, despite being relatively reserved and distant at first, Alcala is now "a different person than the one [he] first met." *Id*. Alcala has fully embraced his faith and, through his resolve and deep introspection, has shown a sincere commitment to personal growth and accountability. *See id*.

Additionally, beginning in September 2024 and still continuing today, Alcala has been an active participant in the Celebrate Recovery Step Study at Gracelife Chapel, working his way through the 12-step recovery process. **Exhibit B** (Celebrate Recovery Letter). Drawing on biblical principles, the program is designed to help individuals "work through their hurts, habits, and hang-ups" through a combination of a structured curriculum, self-reflection, and group discussions centered around personal growth and healing. *Id*. Alcala attends those discussions every Friday night. *Id*.

Those closest to Alcala all invariably attest to the deep transformation he has undergone since his arrest, primarily through his newfound devotion to faith and spirituality. *See* **Exhibit C** (Marcy Wokurka Letter); **Exhibit D** (Michael Wokurka Letter); **Exhibit E** (Amy Ratliff Letter); **Exhibit F** (Jordan Alcala Letter); **Exhibit G** (Kevin Lashley Letter). As described by one of his bible study peers, "I witnessed a profound transformation in Julian. He made the decision to

surrender his life and circumstances to Jesus Christ, and that choice has changed everything about him. … What I can attest to is that he is no longer the same man who made those mistakes." **Exhibit H** (Andrew Garner Letter). According to the church's Lead Pastor, "the Julian Alcala who committed these actions is no more. This is not the same man." **Exhibit I** (Pastor Champ Callahan Letter).

Suffice it to say, Alcala has taken meaningful steps towards rehabilitation that have proven effective. A lengthy term of incarceration will only hinder the successful path he has found outside of custody and delay his future progress. Accordingly, the Court should consider Alcala's rehabilitation in reaching a minimally sufficient sentence.

### V.    Defendant Alcala Poses a Reduced Risk of Recidivism

United States Sentencing Commission data supports the conclusion that Alcala poses a reduced risk of recidivism, as compared with other offenders, and suggests that a sentence that minimizes any term of incarceration is appropriate in this case. *See e.g.,* U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 16 (May 2004), *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (hereinafter "Measuring Recidivism"). The criminal history measure of the guidelines estimates the likelihood of recidivism based on two offender characteristics: prior convictions and prior terms of incarceration. *See* U.S.S.G. §4A1.1 The United States Sentencing Commission's 15-year report, however, concludes that the measure's predictive power would improve if it incorporated additional offender characteristics. *See Measuring Recidivism* at 16.

Recidivism rates decline consistently as the defendant's age increases. *Id.* at 12, 28. Offenders between 21 and 25 years old recidivate at a rate of 31.9%. *Id.* at 28. In comparison,

5

offenders with a criminal history category I between 31 and 35 years old recidivate at the rate of 14.6%. *Id.* Alcala is currently 31 years old. *See* PSR Identifying Data.

Marital status correlates with lower recidivism rates. *See Measuring Recidivism* at 12, 29. Criminal history category I offenders who have never married recidivate at a rate of 22.7%. *Id.* at 29. By contrast, those who are married recidivate at a rate of 9.8%. *Id.* Defendant Alcala has been married to Jordan Alcala since 2018. PSR ¶ 175.

Educational attainment also correlates with lower recidivism rates. *See Measuring Recidivism* at 12, 29. Criminal history category I offenders who have not graduated from high school recidivate at a rate of 21.3%. *Id.* at 29. By contrast, those who have graduated from college recidivate at a rate of 7.1%. *Id.* Alcala is a college graduate, earning an Associate of Applied Science Degree in Criminal Justice Studies in 2023. PSR ¶ 186.

Additional United States Sentencing Commission data supports the conclusion that, as a first offender with no criminal history, Defendant Alcala poses a further reduced risk of recidivism, as compared with other category I offenders, suggesting that a sentencing variance that minimizes Alcala's potential sentence of incarceration is appropriate in this case. *See e.g.*, U.S. Sentencing Comm'n, *Recidivism And The "First Offender"* (May 2004), *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (hereinafter "*First Offender Report*"); *United States v. Tomko*, 562 F.3d 558, 571 (3d Cir. 2009) (upholding a sentence of one year home detention, restitution, community service, and a fine for tax evasion instead of the Guideline's 12-18-month sentence recommendation because of the defendant's negligible criminal history, employment record, community ties, and extensive charitable works).

Collectively, these factors demonstrate Alcala poses a low risk of recidivism and, as such, is a good candidate to receive a sentence that minimizes any term of incarceration, as incarceration is not necessary to achieve the purposes of sentencing.

**VI.    A Sentence at the Low-End of Alcala's Guidelines is Appropriate to Avoid Unwarranted Sentencing Disparities Among Similar Offenders**

Although a small sample size, the JSIN data shows offenders in a similar position to Alcala ordinarily receive a sentence substantially below that which he now requests. Over the past five years, all of such offenders who fell within his same guidelines range (4 total) received a sentence within or below the guidelines. *See* USSC, Judiciary Sentencing INformation (JSIN), available at https://jsin.ussc.gov/analytics/saw.dll?Dashboard (last visited Feb. 24, 2026). The average sentence imposed for such offenders was 11 months' imprisonment. *Id*.

Because the guidelines already take into account the aggravating considerations at play here, including the quantity of counts charged/victims, a sentence at the high-end or above the guidelines would result in an unwarranted sentencing disparity. Thus, to avoid the same, the Court should impose a within-guidelines sentence of 21 months' imprisonment, almost double the average sentence received by like-offenders.

**VII.    Conclusion**

For the foregoing reasons, Defendant Alcala respectfully suggests that a sentence of 21 months' imprisonment would best serve the statutory purposes of sentencing.

Respectfully Submitted,

ROSENBLUM, SCHWARTZ, FRY & JOHNSON, PC

By:     /s/ *Jeff B. Becker*
              JEFF B. BECKER, #74560MO
              Attorney for Defendant
              120 S. Central Avenue, Suite 130
              Clayton, Missouri 63105
              (314) 862-4332/Facsimile (314)862-8050
              jbecker@rsfjlaw.com

## CERTIFICATE OF SERVICE

By signature above, I hereby certify that on February 25, 2025, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Assistant United States Attorney Christine Krug.